Madden, Judge,
delivered tbe opinion of the court:
The plaintiff sues to recover excess profits taxes which it was required to pay for the year 1945. It says that the obligation represented by a “capital note” made by it to the Reconstruction Finance Corporation was, for excess profits tax purposes, equity invested capital, and not borrowed capital; that the Government’s taxing authorities erroneously treated it as the latter in computing the plaintiff’s excess profits tax; and that as a result the plaintiff’s excess profits tax was $5,057.44 larger than it should have been.
The plaintiff is a Missouri corporation engaged in the banking business. It was organized on February 25, 1933, just before the banking holiday, to take over the business of four former banks. At the end of the bank holiday it reopened promptly but, because of declining real estate values, the value and collectibility of its real estate mortgages was impaired and it was in serious need of financial assistance. Early in 1934 it applied to the Reconstruction Finance Corporation which had recently been organized for the purpose of giving financial assistance to banks and other enterprises. The RFC was authorized to purchase preferred stock in corporations which it was willing to assist. However, it was impossible for the plaintiff to issue preferred stock, because Article XII, Section 10 of the Constitution of Missouri required the consent of all the stockholders of a bank organized and operated under Missouri banking statutes, for a bank to issue preferred stock. There were similar restrictions on the power of banks to issue preferred stock in a few other States. To eliminate this impediment, Congress authorized the RFC to purchase legally issued “capital notes” or debentures to enable banks operating under these State restrictions to obtain necessary capitalization. Missouri had, by a statute passed in 1933, Y. A. M. S. § 362.120, authorized State chartered banks to issue capital notes by action of their boards of directors.
Oi February 15, 1934, the plaintiff requested the RFC to purchase $200,000 of five percent capital notes. The request was approved on the same day. The next day the plaintiff issued such a note for $200,000 to the RFC. This original note was replaced by a revised capital note on February 10, *306 1936. The revised note called for interest at a lower rate than that stipulated in the original note.
In its excess profits tax returns for the years 1943,1944 and 1945 the plaintiff computed its excess profits tax credit by the invested capital method. It included in its invested capital credit 100 percent of the outstanding balance of its revised capital note to the RFC. The plaintiff gave corresponding treatment to the payments made by it to the RFC, which payments it says were dividends and the Government says were interest. The Government’s taxing authorities, on audit of the plaintiff’s returns, determined that the plaintiff owed $5,057.44 more excess profits tax than it had paid for the year 1945 because the revised capital note to the RFC should have been treated as representing borrowed capital and not equity invested capital, and that the amounts paid by the plaintiff to the RFC should have been correspondingly treated as interest on invested capital.
The only issue before us is whether the plaintiff’s capital note to the RFC represented equity invested capital, or borrowed invested capital, within the meaning of the excess profits tax statutes.
Parties to transactions cannot, of course, determine the tax consequences or other legal consequences of their transactions by attaching names to them. If the transaction is, in substance, one thing, the parties cannot make it, for legal purposes, another, by giving it, either by intent or as a result of error, the name of another thing. In the instant case the name, capital note, describes borrowed capital. The plaintiff says the transaction was misnamed; that the paper evidencing the transaction would have been more accurately labeled, “certificate of preferred stock”. In truth the transaction had some of the attributes of both a promissory note and preferred stock, and hence was not entirely typical of either. It becomes then a question of which attributes were predominant.
The plaintiff says that the RFC was originally authorized to purchase preferred stock; that the transaction quite certainly would have taken that form but for the impediment of the Constitution of Missouri; that the impediment was surmounted by legislation enacted by Congress and the State *307 of Missouri; but that, in tbe end, the BFC wrote a document which, in most essential respects, put it in the position of a holder of preferred stock. The plaintiff offered, for comparison, and we have received in evidence, a certificate of preferred stock issued to the BFC by another bank in Kansas City which, because it was a national bank, was not restricted by the Missouri Constitution in its power to issue preferred stock.
Comparison of the two documents does show that the BFC was in both cases making investments in the banks to restore their capital, putting its investments at the risk of the earning power of the banks, subordinating its rights to those of depositors and creditors having normal business dealings with the banks. Interest, in the one case, and dividends, in the other, were payable only out of earnings accruing after the date of the capital note and of the issuance of the preferred stock. Both documents provide for the retirement or redemption of the obligations, by call, upon substantially identical terms. Both documents provide for the establishment by the banks of retirement funds or sinking funds for the liquidation of the respective obligations. Both documents provide that in case of liquidation of the banks, the rights of the holders shall be subordinate to the rights of depositors and all other creditors of the banks, except, in the case of the capital notes, other creditors, if any, who agreed, in extending credit, that their rights should be subordinate to those of the holders of the capital notes. Both documents provide that if the banks should be in default in the payment of dividends or interest on the obligations, or in payments into the retirement fund or sinking fund, the holders should have the right to remove directors or officers.
The Government says that the capital note created a definite obligation to pay a fixed sum. It did name a fixed sum, but the obligation to pay it, hedged about as it was with conditions and grants of priorities to other creditors, was by no means definite. It had a definite maturity date, which is evidence of a debt, but that date, read in connection with the numerous subordinating conditions in the note, was the date on which the holder would be paid if the prescribed conditions did not prevent payment. It had a fixed rate of *308 interest, but that rate was no more fixed than, and was identical with, the rate of dividends provided in the comparable certificate of .preferred stock. Both were cumulative, were not currently payable except out of earnings, and were ultimately payable on the same conditions. The holder of the' capital note had no voting rights, but it did have, as we have seen, the power under certain conditions to control the management of the bank. Voting rights are not a necessary attribute of preferred stock.
Our conclusion is that the predominant qualities of the capital note in question were those of preferred stock, and that it should be placed in that classification for legal purposes, including the application to it of the excess profits tax law. The plaintiff is, therefore, entitled to recover, with interest as provided by law, and judgment will be entered to that effect. The amount of the recovery will be determined in further proceedings pursuant to Eule 38 (c).
It is so ordered.
Laramore, Judge; Whitaker, Judge; and Littleton, Judge, concur.